**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| ——————————————— X | |
| JESSICA WICKETT, : | |
| : | Case No. 1:24-cv-1869 |
| Plaintiff, : | |
| : | |
| -against- : | |
| : | |
| VENTURE GLOBAL LNG, INC. n/k/a : | **JURY TRIAL DEMANDED** |
| VENTURE GLOBAL HOLDINGS, INC., : | |
| : | |
| Defendant. : | |
| ——————————————— X | |

**COMPLAINT**

Plaintiff Jessica Wickett, f/k/a Jessica Blake ("Wickett" or "Plaintiff"), as and for her Complaint herein against defendant Venture Global LNG, Inc., now known as Venture Global Holdings, Inc. ("Venture Global", the "Company" or "Defendant"), alleges as follows:

**Nature Of The Action**

1.      This is an action for breach of stock option agreements and wrongful termination. In sum, the Company, acting through its co-founders and majority shareholders Michael Sabel ("Sabel") and Robert Pender ("Pender"), has engaged in a calculated and bad faith scheme to prevent Wickett (among others) from ever exercising her respective vested stock options (the "Options") and acquiring stock in the Company – the very reason she joined the Company when it was a mere start-up ten years ago.  Indeed, Sabel and Pender even went so far as to *fire* Wickett merely for attempting to exercise her Options and complaining about the Company's refusal to allow it, in violation of applicable law.

2.      The Company, a supplier of liquified natural gas ("LNG"), is estimated by JP Morgan as being worth at least $90 billion.  As of September 2024, PIMCO, the Company's largest

outside shareholder, valued the Company as being worth at least $20 billion, with Sabel and Pender together owning approximately 85% (a $17 billion stake at the PIMCO valuation and a $72.5 billion stake at the JP Morgan valuation). Nevertheless, Sabel and Pender have purposefully and in bad faith acted to frustrate Wickett's (and others') exercise of the Options, which have a relatively low value compared to Sabel's and Pender's astronomical holdings, but are worth at least $9 million based on the PIMCO valuation.

3.     The Company hired Wickett as an Associate in 2014 as one of its first four employees. Joining the Company as a start-up came with significant risk, and hence the Company's grant of Options was a critical factor in Wickett's decision to forego recruitment through her MBA program at the prestigious University of Chicago Booth School of Business, through which she could have obtained positions with a higher base salary and target bonus at more established companies. Instead, she joined Venture Global primarily for the Options and the prospect and promises of growth at the Company. The Company initially awarded her 50 ten-year options to purchase Venture Global Class A common shares at a strike price of $1,000 per share (the "2014 Options" pursuant to the "2014 Option Agreement").

4.     Over the next ten years, Wickett rose up the ranks at Venture Global, receiving promotions, increases in responsibility, raises, bonuses, glowing performance reviews and accolades, as well as numerous compliments directly from Sabel and Pender.

5.     In late 2016, the Company granted Wickett an additional 50 ten-year Options to purchase Series A common shares at an exercise price of $2,000 per share (then known as the "GE strike price"), with a vesting start date of January 1, 2017 (the "2016 Options" pursuant to the "2016 Option Agreement"). In early 2018, the Company granted Wickett an additional 50 ten-year Options to purchase Series A common shares at an exercise price of $3,771 per share with a

vesting start date of January 24, 2018 (the "2018 Options" pursuant to the "2018 Option Agreement"), for a total of 150 Options in all.

6.     In April 2023, Sabel himself promoted Wickett to Vice President, Development, and awarded her a raise and a bonus "in recognition of your performance during the 2022 performance year".  In March 2024, Sabel presented Wickett with another raise, as well as another bonus "in recognition of your performance during the 2023 performance year".  In May 2024, Sabel verbally told Wickett that he sincerely hoped she would remain with the Company for many more years.

7.     Wickett's work and devotion to the Company over ten years appeared to pay off. By September 30, 2024, Venture Global's stock was worth at least $62,000 per share (PIMCO valued the stock on its books at $62,492 per share as of September 30, 2024 (*see* Exhibit J hereto). Hence, Wickett's 2014 Options alone were worth at least $3 million (with the Company being worth at least $20 billion) based on the PIMCO valuation.

8.     As the 2014 Options were set to expire in October 2024, Wickett began taking steps to exercise those Options, including discussing the matter with Company General Counsel Keith Larson ("Larson") in September 2024.  Larson told Wickett that Sabel and Pender wanted her 2014 Options to expire and instead would offer to pay her $10,000 per Option.  Wickett indicated to Larson that this was entirely unfair, as she believed that, after ten years at the Company, she should be allowed to exercise her Options.  Wickett also pointed out that the Options were worth millions of dollars, and protested the lowball, $10,000 per Option offer.

9.     Wickett then sent two letters directly to Sabel and Pender dated September 16, 2024.  In one letter, Wickett, *inter alia*, expressed her dedication, devotion and appreciation for the Company and what they had accomplished over the last ten years.  Wickett noted that, other

than Pender and Sabel, she was the longest-serving employee at the Company.   Wickett emphasized that the Option grants were critical to her joining and remaining at the Company during this period, and stated that any refusal to allow her to exercise her Options and to offer her $10,000 per Option instead was "unacceptable".   In the second letter, sent simultaneously,  Wickett attempted to exercise her 2014 Options and obtain the 50 shares of stock in the Company to which she was entitled.   Wickett requested a response by September 23, 2024.

10.     By letter dated Friday, September 20, 2024, Larson informed Wickett that Sabel and Pender had refused to allow her to exercise.   Then, on Tuesday, September 24, 2024 – two business days later – Larson told Wickett her employment was being terminated effective that day and that she needed to be escorted from the premises immediately.   Wickett, despite being understandably shocked about being fired after ten years of stellar work, promotions, raises and praise, nevertheless had the wherewithal to expressly ask: "Keith, am I being fired for exercising my Options?" Larson's face  turned red even attempting to respond, only to lamely claim that there were "other issues".

11.     However, the truth could not be more clear: The Company terminated Wickett for complaining about the Company's refusal to allow her to exercise her Options to obtain stock in the Company (which stock constitutes "Wages" under applicable law), and making a lowball offer instead.   This constitutes unlawful termination and retaliation.

12.     With respect to the Company's refusal to allow Wickett to exercise her 2014 Options, the Company is claiming that Wickett may only exercise her Options with the consent of the Company's so-called "Compensation Committee" (comprised solely of Sabel and Pender), apparently in reliance upon a subsequent stock option agreement from 2017.  However, that 2017 agreement is entirely unsupported by consideration, and is therefore unenforceable under

governing Delaware law.

13.     In any event, even if consent was required – and it is not – governing Delaware law requires that any future act of discretion of a party under a contract, such as a decision whether to grant consent to an option exercise, must be performed in accordance with the implied covenant of good faith and fair dealing, which requires that such discretion be exercised reasonably and in good faith, and that it is bad faith as a matter of law to act solely for purposes of frustrating a holder from exercising an option.

14.     Here, the Company, through Sabel and Pender, acted in bad faith, as there was simply no good faith reason for not granting Wickett consent to exercise.  Indeed, the Company would have benefitted from Wickett (and others) exercising her Options by being paid the proceeds of the exercise price, as well as by the goodwill of rewarding those who have contributed and were continuing to contribute to the Company's considerable success.

15.     Instead, the Company chose to act in bad faith with respect to Wickett (among others) and is therefore in breach of the 2014 Option Agreement.  Sabel and Pender purposefully accepted Wickett's service to the Company and then acted to frustrate the exercise of the Options, intending to cause the Options to purportedly expire, either wholly out of malice, in order to further consolidate their personal ownership, or to avoid dilution at zero cost to them individually.  Rather than acting as a "Compensation Committee" of the Company, Sabel and Pender acted purely in their own personal self-interest to prevent the exercise, which is the epitome of bad faith.

16.     Accordingly, Wickett has been illegally and improperly deprived of the value of her Options and corresponding shares, and is due at least $9 million in damages from the Company for the Options alone.  Further, the Company has wrongfully terminated Wickett in retaliation for seeking lawful wages, and Wickett is therefore entitled to damages believed to be not less than

$1.5 million, including front pay, back pay, damages for mental distress, punitive damages, attorneys' fees and expenses, among other damages that are just and proper.

**The Parties, Jurisdiction and Venue**

17.     Wickett is a citizen of Washington, D.C.

18.     Upon information and belief, the Company is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1001 19th Street, North Suite 1500, Arlington, Virginia 22209.

19.     The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Wickett and Venture Global are citizens of different states.

21.     This Court has personal jurisdiction over the Company because it is a citizen of the Commonwealth of Virginia.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Company resides in this District and a substantial part of the events and omissions giving rise to the claims herein occurred in this District.[1]

---

[1] In response to this Complaint, Venture Global will likely contend that this dispute must be arbitrated pursuant to an arbitration clause in a Restrictive Covenant Agreement executed by the parties effective June 12, 2017, three years after Wickett joined Venture Global and was already working at the Company.  As more fully set forth at paragraphs 44-49, *infra*, this argument fails because the Restrictive Covenant Agreement (including the arbitration and delegation provision therein), like the stock option agreements signed simultaneously, are unenforceable agreements due to a lack of consideration. Wickett received nothing she was not already entitled to for signing the Restrictive Covenant Agreement.  Wickett already owned the purported consideration therefore, namely the 2014 Options and the 2016 Options, prior to executing that agreement.  Further, there is expressly *not* a  promise of continued employment in that agreement.  Nor is there any other consideration.  Moreover, the issue of arbitrability is for the Court, because Wickett not only challenges the enforceability of the Restrictive Covenant Agreement, but also the specific arbitration and delegation clause set forth herein. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 144 (2024) ("where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge"). Further, none of the stock option agreements delegate the issue of arbitrability to the arbitrator, and therefore this is a "two contract" scenario  which must be decided by this Court. *Id*. at 152; *see also* paragraphs 44-49, *infra*.

### Facts Common To All Claims

**A.**     **Wickett Joins The Company And Is Granted The 2014 Options**.

22.     In or about the Summer of 2014, Wickett began discussions with Sabel and Pender about the prospects of joining Venture Global.  Wickett knew Sabel and Pender through her now-husband, who had introduced Sabel and Pender to each other.  Sabel and Pender offered Wickett Options constituting .00125% of the Series A shares of the Company at a $1,000 stock price.  On August 22, 2014, Sabel and Pender formally offered Wickett employment at the Company as an Associate, and Wickett began working at the Company in September 2014.

23.     By letter dated October 2, 2014, Sabel and Pender confirmed that Wickett was awarded 50 ten-year Options at a strike price of $1,000 vesting quarterly over three years, *i.e.,* the 2014 Options and the 2014 Option Agreement (Exhibit A hereto).  The Options began vesting on October 2, 2014. (*Id.*)

**B**.     **Wickett Continues Working At The Company And Is Granted The 2016 Options and 2018 Options**.

24.     Over the next two years, Wickett worked diligently at the Company as they attempted to develop the Company's initial plant, the Calcasieu Pass Plant in Louisiana, so that it would eventually start generating LNG.

25.     In late December 2016, Wickett participated in her annual compensation meeting with Graham McArthur ("McArthur"), then the Company's Chief Financial Officer.  McArthur informed Wickett of her salary for 2017 and that she had been granted 50 additional Options to purchase Series A common shares that would begin vesting quarterly beginning on January 1, 2017 over four years, with a strike price at the "GE price" (General Electric had invested in the Company at a price of $2,000 per share), *i.e.*, the 2016 Options (*see* Wickett's contemporaneous notes at Exhibit B hereto.  The 2016 Options began vesting on January 1, 2017.

26.     As set forth above, the Company subsequently granted Wickett 50 additional ten-year Options in 2018, *i.e.*, the 2018 Options.

27.     Wickett continued working at the Company over the next six years, and vested in all 150 of her Options.

**B.    The Company Wrongfully Prevents Wickett From Exercising Her Options And Obtaining The Shares, And Fires Her For Complaining About It.**

28.     By September 2024, Venture Global's stock was worth not less than $62,000 per share.  Hence, Wickett's 2014 Options alone are worth not less than $3 million.

29.     As the 2014 Options were set to expire in October 2024, Wickett began taking steps to exercise those Options, including discussing the matter with Larson, the Company's General Counsel.  Larson told Wickett that Sabel and Pender wanted her 2014 Options to expire and instead would offer to pay her $10,000 per Option.  Wickett indicated to Larson that this was entirely unfair, as she believed that, after ten years at the Company, she should be allowed to exercise her Options, and in any event the Options were worth millions of dollars, and complained that $10,000 per Option was a lowball offer depriving her of the fair market value of the stock.

30.     Wickett then sent two letters directly to Sabel and Pender dated September 16, 2024 (Exhibits C and D hereto).  In one letter, Wickett, *inter alia*, expressed her dedication, devotion and appreciation for the Company and what they had accomplished over the last ten years.  Wickett noted that, other than Pender and Sabel, she was the longest-serving employee at the Company.  Wickett emphasized that the Option grants were critical to her joining and remaining at the Company during this period, and stated that any refusal to allow her to exercise her Options and to offer $10,000 per Option was "unacceptable".  (*See* Exhibit C).  In the second letter, sent simultaneously,  Wickett attempted to exercise her 2014 Options and obtain the 50 shares of stock in the Company to which she was entitled.  Wickett requested a response by September 23, 2024.

(*See* Exhibit D).

31.    By letter dated Friday, September 20, 2024, Larson informed Wickett that Sabel and Pender had refused to allow her to exercise (*see* Exhibit E hereto).  Larson wrote:  "I am writing to inform you that that the Compensation Committee [Sabel and Pender] did not consent to the exercise of your stock options.  The Compensation Committee's decision was informed by and based on valid and compelling business reasons, and is consistent with all requests to exercise that it has received to date." (*Id.*)  Then, on Tuesday, September 24, 2024 – two business days later – Larson told Wickett her employment was being terminated effective that day and that she needed to be escorted from the premises immediately.  Wickett asked: "Keith, am I being fired for exercising my Options?" Larson's face turned red even attempting to respond, only to weakly claim that there were "other issues".

## C.    No Company Consent Is Required For Wickett To Exercise The 2014 Options Or 2016 Options.

32.    No consent is required for Wickett's exercise of the 2014 Options and the 2016 Options, and the Company's insistence that consent is required constitutes a breach of the 2014 Option Agreement and the 2016 Option Agreement.

33.    In particular, when the Company granted Wickett the 2014 Options and the 2016 Options, there was no consent requirement.  Nor has there ever been any consent requirement in the Company's 2014 Stock Option Plan underlying the Options, as amended.

34.    In contending that consent is required, the Company is relying solely upon two subsequent agreements, namely (i) an Option Agreement Amended and Restated Effective June 12, 2017 relating to the 2014 Options, and (ii) a virtually identical Option Agreement Amended and Restated Effective June 12, 2017 relating to the 2016 Options (collectively, the "2017 Option Agreements"; Exhibits F and G hereto), which were executed by the Company and Wickett on or

about June 12, 2017.  While the 2017 Option Agreements do contain a consent requirement, those 2017 Option Agreements, which are expressly governed by Delaware law, are unenforceable because they lack consideration.

35.     In particular, as set forth above, the 2014 Option Agreement is an enforceable agreement.  It entitled Wickett to the Options covering 50 Series A common shares at a strike price of $1,000 for a ten-year period vesting quarterly over three years (*see* Exhibit A).  Similarly, the 2016 Option Agreement is an enforceable agreement entitling Wickett to Options covering 50 Series A common shares at a strike price of $2,000 (the GE strike price) for a ten-year period vesting quarterly over four years (*see* Exhibit B).

36.     However, once the Options began to be materially "in the money", the Company, through its co-founders Sabel and Pender, endeavored to place new restrictions upon Wickett (and others) in an attempt to prevent Wickett (among others) from ever exercising her Options, in order to enrich themselves and consolidate ownership of the Company, without providing any consideration for those newly-imposed restrictions.

37.     In particular, the 2017 Option Agreements contain a requirement that, pre-IPO, any "exercise may only be effected with the consent of the [Compensation] Committee" (Exhibits. F and G at  p. 3).

38.     While Wickett signed the 2017 Option Agreements, they are unenforceable due to a lack of consideration.  Wickett received no new consideration or benefit to which she was not already entitled in return for that newly imposed consent requirement (among other new requirements imposed upon her) in the 2017 Option Agreements.

39.     In particular, and as set forth above, prior to signing the 2017 Option Agreements, Wickett was *already* entitled to, and owned, the 2014 Options and the 2016 Options at their

respective exercise prices, and already had the entire remaining ten-year term to exercise the vested Options.[2]

40.     Hence, there is nothing in the 2017 Option Agreements that provide Wickett with anything she was not already entitled to.  Thus, they therefore fail for a lack of consideration, and are unenforceable as a matter of Delaware law.  Sabatoro Construction Co., Inc. v. Formosa Plastics Corporation USA, 1996 WL 453460, *3 (Del. Super. June 10, 1996) (a party to a new contract "must receive something of value to which it is otherwise not previously entitled"); Seiden v. Kaneko, 2015 WL 7289338, *6 (Del. Ch. June 10, 2015) (when a party to a contract does not receive anything to which it is not already entitled, the new or amended agreement is unenforceable); Cigna Health and Life Insurance Company v. Audax Health Solutions, Inc., 107 A.3d 1082, 1088 (Del. Ch. Ct. 2014) ("[b]ecause the Release Obligation is a new obligation Defendants seek to impose on Cigna post-closing, and because nothing new is being provided to Cigna beyond the merger consideration to which it became entitled when the Merger was consummated and its shares were canceled, I find that there is no consideration for the Release Obligation").

41.     Indeed, upon information and belief, the Company is well aware that the 2017 Option Agreements required consideration to be enforceable, which is why the Company induced others at the Company to sign other forms of the 2017 Option Agreements by providing them with additional Options in return for signing forms of the 2017 Option Agreements.  However, the Company failed to provide Wickett with anything new whatsoever.  This highlights the lack of consideration for the 2017 Option Agreements.

---

[2] Indeed, the 2017 Option Agreements each provide that the Options began vesting prior to the effective and execution dates of those agreements (October 2, 2014 for the 2014 Options and January 1, 2017 for the 2016 Options), demonstrating that the Options had already been granted to, and owned by, Wickett prior to the execution of the 2017 Option Agreements. (See Exhibits F and G at p.1).

42.     Further, to the extent the Company claims that there was a promise of Wickett's continued employment at the Company in return for signing the 2017 Option Agreements and that this constitutes consideration, this argument fails for two equally compelling reasons.  First, the Company never told Wickett she was required to sign the 2017 Option Agreements or she would be fired.  Second, nothing in the 2017 Option Agreements provide Wickett with a right to continued employment or any other benefit whatsoever.   To the contrary, the 2017 Option Agreements reiterate that Wickett remained an employee at will and could be terminated any time, providing: "This Agreement and the grant of the Option do not give you any right to be retained by the Company or any of its Affiliates in any capacity.  The Company reserves the right to terminate your Service at any time and for any reason."  (Exhibits F and G at p. 6).

43.     As a result, the Company has no basis for relying on the 2017 Option Agreements to prevent Wickett from exercising her Options under the 2014 Option Agreement and the 2016 Option Agreement and obtaining shares, because the 2017 Option Agreements are unenforceable for a lack of consideration.

**D.**    **The Restrictive Covenant Agreement, Including The Arbitration Provision And Delegation Provision Therein, Is Equally Unenforceable; In Any Event, This Is A Court Issue**.

44.     For the very same reasons the 2017 Option Agreements are unenforceable, the Restrictive Covenant Agreement effective June 12, 2017 (the "Restrictive Covenant Agreement"; Exhibit H hereto), presented to Wickett and executed simultaneously with the 2017 Option Agreements on that date, is equally unenforceable.  Although the Restrictive Covenant Agreement states on page 1 that it is "[f]or good and valuable consideration, including the Company stock options granted to Employee as of the Effective Date under the Company's 2014 Stock Option Plan (that are contingent on Employee's execution of this Agreement), the sufficiency of which Employee expressly acknowledges", Wickett already owned and was already vesting in the only

Options she possessed as of the Effective Date, namely the 2014 Options and the 2016 Options, and hence the Restrictive Covenant Agreement fails for a lack of consideration as well.  The Company was well aware that consideration was required for the Restrictive Covenant Agreement to be enforceable, which is why it provided other employees with new and additional Options in return for signing the Restrictive Covenant Agreement.  However, the Company failed to do so for Wickett.

45.     Further, to the extent the Company claims that there was a promise of Wickett's continued employment at the Company in return for signing the Restrictive Covenant Agreement and that this constitutes consideration, this argument fails again for two equally compelling reasons.  First, the Company never told Wickett she was required to sign the Restrictive Covenant Agreement or she would be fired.  Second, nothing in the Restrictive Covenant Agreement provides Wickett with a right to continued employment or any other benefit whatsoever.  To the contrary, the Restrictive Covenant Agreement expressly states there was no promise of continued employment and that Wickett was an employee at will, terminable at any time, providing: "Nothing in this Agreement shall create any right to continued employment or in any way supersede, undermine or otherwise modify the at-will status of the employment relationship between the Company and Employee" (Restrictive Covenant Agreement § 14).

46.     Hence, there is no promise of continued employment, as the Company could have terminated Wickett the moment she signed the Restrictive Covenant Agreement (or the 2017 Option Agreements), before the ink was dry.  Hence, there was no benefit or promise of continued employment (or it was illusory), and therefore this cannot and does not constitute consideration as a matter of law.

47.     For the very same reasons the Restrictive Covenant Agreement is unenforceable,

the arbitration clause at Section 12(b) of the Restrictive Covenant Agreement, including the provision delegating the issue of arbitrability to the arbitrator (via the reference to JAMS rules) is unenforceable for a lack of consideration.  Wickett received nothing she was not already entitled to in return for purportedly giving up her right to have this dispute and the issue of arbitrability heard by a court of law.  Hence, the specific arbitration clause, including the delegation clause, is unenforceable.

48.     Further, as referenced in Footnote 1, *supra*, any issue of arbitrability is for this Court, as Wickett challenges equally the enforceability of the Restrictive Covenant Agreement as a whole and the specific arbitration or delegation provisions therein, for the same reasons.  *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) ("where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge"); *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 338 (4th Cir. 2020) (if plaintiff "specifically challenged the enforceability of the delegation provision, we [the court] must decide whether the delegation provision is enforceable") (internal quotation marks omitted).  Further,"'[i]n specifically challenging a delegation clause, a party may rely on the  same arguments that it employs to contest the enforceability of other arbitration agreement provisions" and must only simply reference the delegation provision.  *Gibbs*, 967 F. 3d at 338 (*quoting MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226-27 (3d Cir. 2018).  Wickett has done so here.

49.     In the alternative, should the Court find that the arbitration and delegation provisions are supported by consideration (and Wickett respectfully submits it should not), the dispute over whether Wickett may litigate rather than arbitrate her claims (and the question of who resolves that very dispute) are questions for this Court.  Because there is more than one contract at issue—one expressly sending disputes over arbitrability to arbitration, the others (including the

2015, 2016, 2017 and 2018 Option Agreements) silent and thus implicitly sending them to the courts—the Court must apply contract formation and interpretation principles to determine which contract governs. *Coinbase*, 602 U.S. at 152 ("where, as here, parties have agreed to *two* contracts – one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts – a court must decide which contract governs. To hold otherwise would be to impermissibly 'elevate [a delegation provision] over other forms of contract'") (*quoting Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010)).

## **<u>FIRST CAUSE OF ACTION</u>**

### **(Breach and/or Repudiation of the 2014 and 2016 Option Agreements)**

50.     Wickett repeats and realleges each and every allegation set forth above as if fully set forth herein.

51.     As set forth above, the Company awarded Wickett the 2014 Options and the 2016 Options pursuant to the 2014 and 2016 Option Agreements, respectively, which are enforceable agreements between the parties.

52.     Under the 2014 Option Agreement, Wickett is entitled to, and owns, Options covering 50 Series A common shares at an exercise price of $1,000, which, pursuant to the terms of the 2014 Option Agreement,  she is free to exercise at any time during the ten-year term.

53.     Under the 2016 Option Agreement, Wickett is entitled to, and owns, Options covering 50 Series A common shares at an exercise price of $2,000, which, pursuant to the terms of the 2016 Option Agreement,  she is free to exercise at any time during the ten-year term.

54.     There is no requirement in the 2014 and 2016 Option Agreements that Wickett obtain the Company's consent to exercise the Options.

55.     Nevertheless, the Company has breached and/or repudiated its obligations under

the 2014 and 2016 Option Agreements by refusing to allow Wickett to exercise the Options thereunder and/or obtain shares in the Company.

56.     To the extent the Company is relying upon the 2017 Option Agreements in insisting on a consent requirement, that reliance fails because, as set forth above, the 2017 Option Agreements are unenforceable for a lack of consideration.  Wickett received absolutely nothing to which she was not already entitled to in signing the 2017 Option Agreements; therefore, they are unenforceable as a matter of law.

57.     Wickett has fully performed her obligations under the 2014 and 2016 Option Agreements.

58.     To the extent relevant or required, Wickett was ready, willing and able to exercise her 2014 Options, including paying any related taxes.  Further, at any and all relevant times, Wickett would have been ready, willing and able to exercise her 2016 Options.

59.     By letters dated September 16, 2024, Wickett attempted to exercise the 2014 Options.  However, by letter dated September 20, 2024, the Company refused to allow Wickett to exercise, claiming that consent was required, and that the "Compensation Committee" declined to give consent, in breach of the 2014 and 2016 Option Agreements.

60.     Further, as set forth above, the Company has repudiated its obligations under the 2014 and/or 2016 Option Agreements by contending that consent to exercise is required, when it is not.

61.     The Company's breach and/or repudiation of its obligations under the 2014 and 2016 Option Agreements have caused Wickett damages in an amount to be determined at trial, but believed to be not less than $6 million based on the PIMCO valuation (*see* Exhibit J hereto).

62.     In the alternative, Wickett seeks declaratory relief requiring the Company to allow

her to exercise her 2014 Options and her 2016 Options.

**SECOND CAUSE OF ACTION**

**(Breach of the 2017 Option Agreements, the 2018 Option
Agreement and the Implied Covenant of Good Faith and Fair
Dealing Thereunder (In the Alternative for the 2014 Options and the 2016 Options))**

63.     Wickett repeats and realleges each and every allegation set forth above as if fully set forth herein.

64.     In the alternative, if this Court finds that the 2017 Option Agreements are supported by consideration and enforceable, though it is respectfully submitted that the Court should not do so, the Company has breached the 2017 Option Agreements and/or the implied covenant of good faith thereunder by refusing, through the purported "Compensation Committee", to grant consent for Wickett's exercise of the Options.

65.     "In Delaware, the implied covenant of good faith and fair dealing inheres in every contract, including those governing employment.  The covenant requires parties to a contract to refrain from arbitrary or unreasonable conduct which deprives a party from receiving the fruits of the bargain." Markow v. Synageva Biopharma Corp., 2016 WL 1613419, *7 (Sup. Ct. Del. March 3, 2016) (internal quotation marks omitted).  "The covenant of good faith and fair dealing embodies the law's expectation that each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.  The covenant protects an agreement's spirit against underhanded tactics that deny a party the fruits of the bargain."  Sheehan v. AssuredPartners, Inc., 2020 WL 2838575, *11 (Ch. Ct. May 29, 2020) (internal quotation marks omitted).

66.     Further, "a stock option, in and of itself, [] engenders a duty of the employer to deal in good faith, i.e., [to] refrain from directly frustrating the exercise of the option."  Haney v. Laub, 312 A.2d 330, 334 (Sup. Ct. 1973).  The company may not act to "otherwise frustrate the exercise

17

of the options for that purpose or reason".  Haney, 312 A.2d at 333.

67.     "The implied covenant is particularly important in contracts that endow one party with discretion in performance, i.e., in contracts that defer a decision at the time of contracting and empower one party to make that decision later.  Simply put, the implied covenant requires that the 'discretion-exercising party' make that decision in good faith."  Amirsaleh v. Board of Trade of the City of New York, 2008 WL 4182998, *8 (Ch. Ct. September 11, 2008); Charlotte Broadcasting, LLC v. Davis Broadcasting of Atlanta, LLC, 2015 WL 3863245, *7 (Sup. Ct. June 10, 2015) ("the implied covenant of good faith particularly applies where the contract permits a party to exercise sole discretion.  Delaware case law requires a party to exercise such discretion reasonably and in good faith). "[P]arties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms."  Amirsaleh, 2008 WL 4182998 at *8-9.

68.     "More recent case law reflects a willingness to allow implied covenant claims to survive, despite the presence of relevant contract language, where a defendant failed to uphold the plaintiff's reasonable expectations under that provision or failed to exercise discretion under the contract reasonably."  Markow v. Synageva Biopharma Corp., 2016 WL 1613419, *7-8 (Sup. Ct. Del. March 3, 2016) (internal quotation marks omitted, emphasis in original).

69.     Further, a duty to disclose reasonable information goes hand-in-hand with the duty to act in good faith. As set forth above, the Company has a duty to refrain from directly frustrating the exercise of the option, which may include refusing to provide information reasonable and necessary to the decision to exercise and/or the process of exercising the options.  See, e.g., Powe v. Cambium Learning Company, 2009 WL 2001440, *4-6 (S.D.N.Y. July 9, 2009) (a failure to provide requested information that thereby prevents option holder from exercising option(s)

constitutes a breach of the company's obligations because allowing exercise of the options was contemplated under the agreement); Lentz v. Mathias, 2022 WL 2719504, *17-18 (Ch. Ct. July 13, 2022) (company has general duty of disclosure to those associated with the company making an investment decision); SEC Rule 701(e), 17 CFR § 230.701 (option holders entitled to financial information from a private company).

70.     Here, co-founders and majority shareholders Sabel and Pender, who comprise any so-called "Compensation Committee", acted in bad faith in attempting to prevent the exercise of the Options and frustrate Wickett's (and others') right to obtain shares in the Company, in order to enrich themselves, consolidate their ownership of the Company, avoid dilution of their shares at zero cost, and/or simply to be malicious.

71.     The Company is the discretion-exercising party and is required to exercise that discretion reasonably and in good faith, yet has clearly failed to do so.

72.     Indeed, the Company, Sabel, Pender and/or the alleged Compensation Committee are required to act reasonably and in good faith in considering a grant of consent, and to not act for an improper purpose, such as preventing the exercise of the Options for the mere sake of doing so in bad faith.  They have failed to act reasonably or in good faith and have acted for improper purposes, as evidenced by, among other things, the following, upon information and belief:

- The Company failed to set up a Compensation Committee that is independent and objective, which one would reasonably expect the Company to have established under the circumstances;

- There were no true contemporaneous deliberations of the Compensation Committee, and certainly not by any independent members thereof, much less any transparency into either the decision-making process or the basis of the decision itself;

- To the contrary, the decision to withhold consent was made solely by Sabel and Pender for the sole purpose of benefitting themselves or to act maliciously to deprive Wickett of her Options (see, e.g., Markow, 2016 WL 1613419 at *7-8 (Board acted unreasonably and in bad faith in purposefully waiting to price options in order to secure a financial windfall for themselves, as such conduct "frustrated [plaintiffs'] reasonable

expectation of receiving the fair market value of their options, as bargained for under their employment agreements"); <u>Sheehan</u>, 2020 WL 2838575 at *11 (allegations that company terminated employees "in order to steal [their] Class B Profits Interest for zero consideration to pay nothing more than the cost for the [employees'] Class A-2 Interests adequately pleads that the defendant's conduct [was] driven by an improper purpose"; breach of implied covenant claim sustained)); and/or

- In the alternative, the decision to withhold consent was made for the additional purpose of improperly favoring others more connected to the Company, including Sabel and Pender (<u>see</u>, <u>e.g.</u>, <u>Amirsaleh v. Board of Trade of City on New York, Inc.</u>, 2009 WL 3756700 at *4 (Ch. Ct. Nov. 9, 2009) (giving "connected" members more time to elect merger consideration to be received "would plainly amount to bad faith").

73.     The Company's wrongdoing is further evidenced by its refusal to disclose to Wickett the *reasons* for the purported decision to withhold consent, despite its duty to disclose. This is quite telling and demonstrates that any decision and the decision-making process were improper (<u>see</u>, <u>e.g.</u>, <u>Amirsaleh</u>, 2008 WL 4182998 at *8-9 (company's "clandestine and unexplained decision to stop accepting late forms [for election to exercise options]" in an "arbitrary or unreasonable" manner thereby frustrating the "overarching purpose" of the agreement is sufficient to demonstrate a breach of the implied covenant of good faith).

74.     Indeed, the Company did not even attempt to formulate a reason, such as explaining to Wickett that the decision was based on timing and would be revisited at a later date – this was a flat-out rejection without explanation, recourse, or any valid rationale.

75.     Further,  it is arguably to the *benefit* of the Company to allow holders to exercise options because the Company would receive the proceeds thereof, and to establish goodwill by allowing persons who contributed and/or are contributing to the Company's success to share in the benefits thereof.

76.     The whole point of granting Wickett the Options was to allow her to participate in the Company's success should it occur, and there is no reasonable justification for depriving Wickett of this opportunity to participate.  Given the massive wealth obtained by Sabel and Pender,

there is no good faith basis for their attempts to frustrate Wickett's exercise.  Instead, Sabel and Pender purposefully acted to attempt to cause the 2014 Options to purportedly expire and become worthless by frustrating their exercise in order to benefit themselves personally.

77.     Further, Sabel and Pender acted in bad faith in attempting to extort Wickett to accept $10,000 per Option, which is a mere fraction of their true value of over $60,000 per share. In doing so, Sabel and Pender were trying to benefit themselves by consolidating their ownership of the Company or avoiding dilution of the shares they each own at zero cost.

78.     Indeed, Sabel and Pender are well aware that, upon information and belief, nearly $1 billion in Options are outstanding and there is a significant risk of dilution to them personally in the event the Options are exercised.  Sabel and Pender are apparently acting in their personal self-interest to prevent exercise of the Options, thereby acting in bad faith.

79.     Further, upon information and belief, Sabel and Pender have acted in a contradictory or arbitrary fashion in refusing to grant consent, which is further evidence of bad faith.  For example, Sabel and/or Pender, upon information and belief, advised former employees that they were refusing to grant consent because they did not want former employees to own stock in the Company, but the denial of consent to Wickett, then a current employee, demonstrates that this purported rationale is misleading or a pretext.  Upon information and belief, the Company has been acting in a contradictory, arbitrary, unfair and misleading manner with others as well, evidencing bad faith.

80.     Further, as set forth above, the Company has repudiated its obligations with respect to the 2016 Options, the 2018 Options, and with respect to the 2017 Option Agreements and 2018 Option Agreement, by essentially stating that it will never consent to the  exercise of the Options under any circumstances whatsoever, which is the epitome of bad faith.

81.     Thus, the Company has breached and/or repudiated its obligations under the 2017 Option Agreements and the 2018 Option Agreement and/or the implied covenant of good faith thereunder by acting improperly and in bad faith to frustrate Wickett's attempt to receive the fruits of her Options,  namely the shares, which are the very reason she became associated with the Company in the first place.

82.     Wickett has fully performed her obligations under the 2017 Option Agreements and the 2018 Option Agreement.

83.     To the extent relevant or required, Wickett was ready, willing and able to exercise her 2014 Options, including paying any related taxes.  Further, at any and all relevant times, Wickett would have been ready, willing and able to exercise her remaining Options.

84.     Wickett would not have joined the Company, then a start-up nowhere close to generating any LNG, at considerable risk to herself and her livelihood, nor remained at the Company for ten years working tirelessly, but for the Options and the upside they presented.

85.     The Company's breach and/or repudiation of its obligations under the 2017 Option Agreements and the 2018 Option Agreement have caused Wickett damages in an amount to be determined at trial, but believed to be not less than $9 million based on the PIMCO valuation (see Exhibit J).

86.     In the alternative, Wickett seeks declaratory relief requiring the Company to allow her to exercise her 2014 Options, her 2016 Options and her 2018 Options.

## THIRD CAUSE OF ACTION
### (Wrongful Termination/Retaliation)

87.     Wickett repeats and realleges each and every allegation set forth above as if fully set forth herein.

88.     The Company's principal place of business is Virginia, and therefore the Company

is and was at all relevant times subject to Virginia's labor and employment laws.

89.     Under Virginia's Wage Payment Act, Virginia Code § 40.1-29(C), it is unlawful for an employer to "withhold any part of the wages or salaries of any employee except for payroll, wages or withholding taxes or in accordance with law, without the written and signed consent authorization of the employee".

90.     Section 60.2-229(A) of the Code of Virginia defines wages broadly so as to include stock and other non-cash compensation: "'Wages' means all remuneration paid, or which should have been paid, for personal services, including commissions, bonuses, tips, back pay, dismissal pay, severance pay and any other payments made by an employer to an employee during his employment and thereafter *and the cash value of all remuneration payable in any medium other than cash*" (emphasis added).

91.     The shares of Venture Global common stock to which Wickett was entitled to upon exercise of the 2014 Options are "remuneration" in a "medium other than cash", and therefore constitute Wages under Virginia law.

92.     Virginia Code Ann. § 40.1-27(3)(A)(1) makes it unlawful for an employer to "discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . in good faith reports a violation of any federal or state law or regulation to a supervisor . . . ."

93.     As set forth above, in September 2024, Wickett complained to Larson, General Counsel of the Company who was in a supervisory role to Wickett with respect to the Options and her rights thereunder.  Wickett expressed concern to Larson that Sabel and Pender, as the so-called "Compensation Committee", appeared to be improperly refusing to allow her to exercise her 2014

Options.  Wickett also complained to Larson that Sabel's and Pender's offer of $10,000 per Option for her 50 Options was far below market value for the Options, which at the time she estimated at $4.5 million.  Wickett also expressed that her intention was to exercise the 2014 Options, at a strike price of $1,000.

94.     Further, in one of her letters to Sabel and Pender dated September 16, 2024, Wickett, *inter alia*, similarly complained to Sabel and Pender, her supervisors, that it would be improper and "unacceptable" for Sabel and Pender to refuse to allow her to exercise her Options and obtain the shares, and that their $10,000 per Option offer (requiring that she allow the 2014 Options to expire unexercised) would deprive her of the fair market value of the Options (*see* Exhibit C).

95.     Thus, Wickett reported to her supervisors her good faith belief that the Company was depriving her of Wages to which she was entitled, which is a violation of Virginia law.

96.     As set forth above, Wickett sent the letters to Sabel and Pender on Monday, September 16, 2024.  On Friday, September 20, 2024, the Company informed her that it was refusing to allow her to exercise her Options.  The Company fired her two business days later, on Tuesday, September 24, 2024.

97.     The Company clearly fired Wickett in retaliation for her attempt to exercise the Options and for expressing displeasure about Sabel and Pender not letting her do so, as well as complaining about Sabel and Pender trying to instead obtain the Options at a bargain basement rate.

98.     Indeed, Wickett was one of the first four employees at the Company and had been there for ten years, making her the longest tenured employee at Venture Global other than the founders themselves, Sabel and Pender.  Her now-husband even introduced Sabel and Pender to

one another, paving the way for a multi-billion dollar success.  During her time at the Company, Wickett received stellar performance reviews, numerous raises and bonuses, and grants of Options. As late as May 2024, Sabel told Wickett that he hoped she would remain at the Company for many years.  And in her September 2024 conversation with Larson about the Options, Larson expressly told Wickett that Sabel and Pender appreciated her contributions and wanted her to keep working at Venture Global.  Further, when Larson terminated Wickett's employment, Wickett point-blank asked Larson if she was being fired for trying to exercise her Options.  Larson's face turned red and he tellingly could proffer no substantive response.

99.     Thus, Venture Global wrongfully terminated Wickett in retaliation for stating her good faith belief that the Company was depriving her of her stock, *i.e.,* Wages, which is a clear violation of Virginia law.

100.     Accordingly, Wickett is entitled to damages in amount to be determined at trial, but believed to be not less than $1.5 million, including back pay, front pay, damages for mental distress, attorneys' fees and expenses and/or punitive damages, among other damages that are just and proper.

### FOURTH CAUSE OF ACTION

### (Violation of the Virginia Wage Payment Act)

101.     Wickett repeats and realleges each and every allegation set forth above as if fully set forth herein.

102.     The Virginia Wage Payment Act, Virginia Code § 40.1-29, provides employees with a private right of action for improperly held wages.

103.     As set forth above, Virginia law defines wages broadly to include all cash and non-cash remuneration for services, which includes stock.

104.     As described in greater detail, the Company improperly refused to allow Wickett to obtain 50 shares of Company stock prior to her employment termination, the cash value of which is at least $3 million.   Wickett never agreed or consented to the Company withholding this compensation.

105.     Employers that improperly withhold wages under the Virginia Wage Payment Act are liable for direct damages, liquidated damages (equal to direct damages), pre-judgment interest and attorney's fees.

106.     Further, under the Virginia Wage Payment Act, treble damages are permitted for knowing violations, which only requires actual knowledge of the information and does not require a showing of specific intent to defraud.   The Company's acts as set forth above constitute a knowing violation under the statute.

107.     Hence, Wickett is entitled to either double or triple the direct damages due relating to, at the very least, the 2014 Options.

WHEREFORE, Wickett demands judgment as follows:

(i)      On the First Cause of Action, awarding Wickett damages in an amount to be determined at trial, but believed to be at least $6 million based on the PIMCO valuation (and at least $24 million based on the JP Morgan valuation), plus interest, attorneys' fees and costs to the extent allowable by law;

(ii)     On the Second Cause of Action, in the alternative as to the 2014 Options and the 2016 Options, awarding Wickett damages in an amount to be determined at trial, but believed to be at least $9 million based on the PIMCO valuation (and at least $36 million based on the JP Morgan valuation), plus interest, attorneys' fees and costs to the extent allowable by law;

(iii)    On the Third Cause of Action, awarding Wickett damages in an amount to be determined at trial, but believed to be not less than $1.5 million, including back pay, front pay, damages for mental distress, attorneys' fees and expenses and/or punitive damages;

(iv)    On the Fourth Cause of Action, damages in an amount to be determined at trial, including double or triple the direct damages due relating to, at the very least, the 2014 Options, plus attorneys' fees and expenses;

(v)     In the alternative, for declaratory relief on the First and Second Causes of Action requiring the Company to allow Wickett to exercise her 2014 Options, her 2016 Options and her 2018 Options;

(vi)    Pre-judgment and post-judgment interest as allowable by law; and

(vii)   For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.


Dated: October 24, 2024

SULLIVAN & WORCESTER LLP

By: */s/ Michael T. Dyson*
    Michael T. Dyson (VA Bar No. 40962)
    1666 K Street, NW
    Washington, D.C. 20006
    Telephone: (202) 775-1217
    Facsimile: (202) 775-6875
    mdyson@sullivanlaw.com

Gerry Silver, Esq.
(seeking admission pro hac vice)
SULLIVAN & WORCESTER LLP
1251 Avenue of the Americas, 19th Floor
New York, New York 10020
Telephone:  (212) 660-3096
Facsimile:   (212) 660-3001
gsilver@sullivanlaw.com